JENNIE R. SMITH AND COVERT D. BENNETT, PLAINTIFFS IN ERROR, AND STATE OF NEW JERSEY, DEFENDANT IN ERROR.

1. It is error in law if, in the charge of a judge in a criminal case, a fact of moment clearly connected with the merits is stated to be in proof, when such fact has neither testimony nor the color of testimony to support it.

2. The charge stated that it was a part of the story of the defendant that the murderer had come in through an opening in the floor of a closet, the fact being that she had never made such a statement—*held*, error, and the judgment reversed.

On error to the Supreme Court.

The facts in this case, and the points relied on for a reversal of the judgment below, sufficiently appear by the opinions delivered in this court.

For the plaintiffs in error, *C. H. Winfield* and *G. Collins.*

For the state, *John P. Stockton, Attorney General.*

BEASLEY, CHIEF JUSTICE. This record and the proceedings at the trial are before this court for the single purpose of obtaining a review of the law as it was administered in the Court of Oyer and Terminer, and as it was re-established in the Supreme Court. The testimony is before us *in extenso,* but with it we have, officially, no concern, except so far as it elucidates, or is connected with, the procedures and legal rulings at the trial. So entirely is this true that even if we were satisfied that these defendants were innocent of the crime of which they have been convicted, we could not, on that account alone, interfere in anywise with this judgment, for the power of giving relief in such a juncture is in other hands than ours. When we shall have responded to the question whether these defendants have been tried according to the modes and rules established by the laws of this state, our whole duty will be performed, for to do more than this would be an intrusion upon that authority with which, by the constitution, another tribunal has been invested. I shall, therefore, address myself exclusively to an examination of the errors in law that are alleged to have supervened in the course of these proceedings.

The first objection to be noticed is a formal one. It appears that the defendants, prior to the occasion that resulted in this verdict, had been put upon their trial, on this same indictment, before another jury, and that a member of such jury becoming insane, such jury was, on that account, discharged by the trial court. This circumstance appearing on the record before us as a part of the course of law taken in the case is now assigned as error, the ground being, not that the court, if the necessity arose, could not have rightly discharged the jury, but that in this instance the proceedings on which such judicial action was based, were irregular and illegal. The recital on the record of this affair is as follows, to wit:

"At which last-mentioned day, during the continuance of the trial of said issue, it is suggested to the court that one of the jurors last above named, to wit, Herman Deuben, has become and is deranged in his mind, and that thereby he is incapacitated to speak the truth of and concerning the premises, and thereupon the said court ordered the said juror, the said Herman Deuben, to be attended and examined by skilled physicians (designated then and there by the said court), and the said physicians then and there made full examination of the said Herman Deuben, as to the state and mental condition of him, the said Herman Deuben, and the said physicians then and there in open court are sworn to make true answer to such questions as shall be put to them respecting the state and mental condition of the said juror, the said Herman Deuben, and are then and there examined touching the state and mental condition of the said juror, Herman Deuben, and it appearing to the court that the said juror, Herman Deuben, has become and is deranged in his mind, and is thereby incapacitated to speak the truth of and concerning the premises, and that there is no prospect of his recovery, the court discharges the said juror and the said jury from giving a verdict in the premises, and adjudges that no trial of the issue aforesaid has been had; and hereupon let the said indictment be continued until," &c.

With respect to the procedure thus presented, two errors are assigned—first, that the defendants were not present when the physicians examined the juror; nor, second, when the testimony of such physicians was taken in court.   Touching this latter exception, it is sufficient to say that it is not sustained by the proof, but, on the contrary, the record, read according to legal intendment, shows the reverse.   The statement is that the trial was continued to the day on which this examination was taken, and it is also averred that such examination was in open court.   When a defendant is shown to be present at the commencement of the trial, the presumption of law is that he is also present at each day to which the trial is regularly, *de die in diem*, continued.   It must, therefore,

be considered as conclusively shown that the examination of the physicians was in the presence of the defendants, and that consequently this objection, even if there is anything in it as a legal proposition, has no basis of fact upon which it can rest.

The second objection, which embraces the contention that the defendants should have had the opportunity of being present when the juror was undergoing examination by the physicians, is not valid. The court could have examined any person who was acquainted with the mental condition of the juror, and without regard to the fact whether such person had acquired his knowledge touching such condition in the presence or in the absence of the prisoner. Such is the every-day practice of the courts in this class of cases. These proceedings are always summary in their character, and of necessity must rest almost entirely in the discretion of the court, and the exercise of such discretion must be deemed conclusive, except it may be in a clear case of the abuse of such authority. Nothing of the kind in this instance is pretended, and no objection whatever, so far as appears, was taken at the time by the counsel of the defendants to any part of this transaction.

Before leaving this topic it is proper to say that the objection of the attorney general to the right of the defendants to assign as errors the foregoing matters, has been considered, and that it is deemed such objection is not tenable. The contention was, that what had taken place at the former trial was a matter of fact which, if a bar to a further prosecution, should have been pleaded at the last trial, and that if the state should, in the common form, deny such assignments, an issue of fact would be raised. But this view, I think, is not in harmony with the precedents. The general rule is that whenever a material error is evident on the face of the record, the judgment must, on that account, be reversed, and consequently any error thus appearing may be assigned for error. The issues thus raised, as they are to be proved by the record itself, are issues of law and not issues of fact. If, however, a former trial is set up, being no part of the proceedings in the pending case, but a distinct thing from it, the fact of such former trial

would have to be pleaded, and could not be assigned for error. The following authorities will be found to elucidate the subject: 2 *Tidd's Prac.*, tit. "*Writ of Error,*" and the cases cited; *Gilliland* v. *Rappelyea,* 3 *Green* 138 ; *Winsor* v. *Queen, L. R.*, 1 *Q. B.* 289–390.

The series of exceptions that next require attention approach more nearly the merits of the case, relating as they do to alleged misconceptions of the judge as to various matters of fact, and his instructions to the jury founded on such misconceptions. These exceptions are fourteen in number, and it is obvious, at a glance, that the bulk of them cannot be of any avail to the defendants in this court, as they seek to call into question certain expressions of judicial opinion on the facts and weight of evidence. That a judge has a right to give his own views to the jury with respect to the value of the testimony, or upon the merits of the case, is, and always has been, the law of this state. Such, therefore, of the objections in question as are of the character just indicated, will receive no attention ; but there is an objection that has been taken to the charge of the judge, which is of a different nature, and which is clearly outside of the protection of the rule just mentioned. The instance thus referred to is of vital importance, on account of its close connection with the merits of the case, and of the effect the judicial remarks in question may reasonably be presumed to have had on the minds of the jury.

The portion of the instructions of the judge to the jury to which I now refer, occurs in that part of it which contains a summary of the facts tending to show the connection of Mrs. Smith with this crime, and this is its language, viz. :

" The doctor is called, and the officers come in, and they commence an investigation. As they walk through the rooms looking for signs, she points out to them a bottle of chloroform and a towel; she calls their attention as they pass—I am speaking now of the testimony of the officers—she calls attention, by the opening of a closet door, to the removal of the board, making an opening in the floor, and the change of the position of the crocks. The crocks were changed, and

the board was removed. The chloroform bottle was there, and there was a towel, with which the chloroform might have been administered. The facts corroborate her story, and she either believed that story was the truth, and it was the truth, or else it bears on its face evidence of contrivance to elude and deceive and avert suspicion. It is one or the other. Which is it? That is a point that has been debated here between the different sides. Either this story is true, that somebody came in by this broken floor and removed the crocks, and used chloroform upon her, then struck her husband, and left while she slept, or else it makes strong evidence that she was a participant in the act, and these signs—the chloroform bottle and the towel, the closet, the crocks and the board—are but deceptive appearances contrived by her either alone or some one with her, to elude inquiry and to avert suspicion. Which is it? In ascertaining this, you have to look closely at all the circumstances. Little things here may tell the story. When you are following the track of the secret assassin, you have got to look at every step to see where it leads; at every sign, and read it carefully. Upon the truth of her story you may ask yourselves the question—why go in this house that way?

"It is possible and probable that you will ask yourselves whether it is likely that one could go up through that floor—the floor seven feet, I believe the witnesses say, above the cellar floor. There is a ledge along the wall, the precise height of which I don't remember, but there is testimony to show, and it appears upon the drawings. A man must draw himself from the cellar floor on this ledge, up through this hole, which was about two feet wide, without the crocks being there; fourteen or sixteen inches high, between the other boards and the stairs above, a man must draw himself up; he must have the use and force of his arms to do it, with such aid as he can get with his feet on the ledge. It may be, perhaps is, a possible thing to be accomplished. The jury will look at that. If it were not possible to do, it is an important circumstance in the case, as it is the only place where there is any sign of violence

in gaining entrance.   No window or door is broken ; indeed, so far as appears, the doors were not locked nor the windows fastened.   Why go into the cellar and break up a floor, and remove earthen and iron jars, to get in a house, where they had but to turn the latch of the door or step through the window ?   These are matters the jurors must pass upon, because they tend to throw light upon this question of whether the truth is told, or whether there is a design or contrivance. Why should he go out that way—why creep through such a space into the cellar to get out to the closet, where the weapons were found, if these were the weapons that were used ?"

It will be observed that, in these remarks, the learned justice ascribes to this defendant the " story " that " somebody came in by this broken floor and removed the crocks," just as he ascribes to her the story of her having been stupefied by chloroform.   With regard to the use and effects of the drug upon her, he had a clear right to hold her responsible for such statements, because that she had made a statement to that effect was an incontestable fact in the case, and was admitted on all sides ; but had he a right to assert, in his charge to the jury, that the " story " of this defendant was that the murderer had entered by removing the board in this closet ?   If it was her story, then she had narrated the fact as a part of her experience, just as she had the fact of having been made insensible by the chloroform.   In the judicial statement, the one circumstance is as much a part of her story as the other is ; they both are represented as portions of her narrations of matters that had equally come under her own observation.   The language used is :   " Either this story is true, that somebody came in by this broken floor and removed the crocks, and used chloroform upon her, and struck her husband, and left while she slept."   Now she had testified that she had tasted and had felt the effects of the chloroform, and when but semi-conscious had heard the sound of the assassin's blow.   These things she had told, and they were her story.   Had she stated in the same way that somebody had come in through the broken floor of this closet ?   And not only in the clause just quoted

does the charge impute this statement to the defendant, for in a subsequent passage the jury is told, " Upon the truth of her story you may ask yourself the question : why go in this house in that way ?" That is, in order to test the truth of the defendant's story that the murderer had effected his entrance through the broken floor of the closet. The attention of the jury is invited to the improbability of such story, from the great difficulty of a person being able to force a passage for himself in this way. The charge then proceeds to describe, in a forcible manner, the difficulties to be overcome in effecting such an entrance, and concludes the description of such an endeavor with the remark, " It may be, perhaps is, a possible thing to be accomplished." Thus the defendant is held up as responsible before the jury for a story as to the way the murderer got access to his victim, which is so intrinsically improbable that, to the mind of the presiding justice, its truth is only within the range of possibility. Undoubtedly this judicial exposition of the case put this defendant in great peril.

The inquiry then arises, was this defendant liable at all, under the evidence, to the imputation of having told this improbable, not to say impossible, story? Was the learned justice justified, in any degree, in laying to her account the story that the murderer had entered in this way, in the same sense that he could lay to her account the statement with regard to the chloroform. The answer to this depends altogether on the circumstance whether there was any evidence whatever in the case tending to show that this defendant had made the statement in question. Was there any proof, direct or inferential, that she had ever told any story whatever on this subject? If there was, then the judicial assumption from such evidence of the fact, and the presentation of it as a fact, however indiscreet or ill-advised such an assumption may have been, and however clearly such indiscretion would have been effective in procuring a new trial on a motion for that purpose, will not constitute an error in law upon which this court can reverse this judgment. The ques-

tion is, therefore, whether there was any testimony upon the subject, or whether the alleged fact of her having told such a story, was an introduction by inadvertence, into the proofs, of a foreign ingredient. That is a matter that can be settled only by an appeal to the evidence, and as the point is of so much consequence I have collected all the testimony on the subject, and will set it out in full.

The first witness testifying on the point was John A. O'Neil, a police officer, and the following is a transcript of his deposition. He says—

"*A.* I arrived there about ten minutes past eight that morning; I immediately began a search for weapons, and didn't find any; I found a board underneath the stairway leading from the basement to the first floor. *Q.* Point out on the diagram where you found that board? *A.* [Pointing on the diagram]—It was right underneath here; under that stairway, down in the cellar. *Q.* In a closet, was it? *A.* Yes, sir. *Q.* That is, under the closet that was in the kitchen? *A.* Yes. *Q.* What sort of a board was that? *A.* It was a common pine board, eight or ten inches wide, about twenty inches in length; I showed it to officer Mc-Horney in the presence of Mrs. Smith, and she said that was the board that belonged in the end of the pantry; she said it was a board that was missing from that closet; there was a board missing from the farther end. *Q.* Did you notice any plaster on the board? *A.* Yes. *Q.* Was the plaster broken in the closet? *A.* Yes. *Q.* What else did you do in connection with the case? *A.* That is all I done to the house."

The next witness was Michael G. Lennon, the captain of the police, who said—

"I then left the bed room and went into the kitchen, and Mrs. Smith opened the closet door and told me that the jars in the closet had been moved; she made an exclamation, 'Oh, they have moved my jars, or crocks;' and there had been a board taken out of the end of the closet; I looked into the closet and found the jars had been arranged on the right or eastern side of the closet, and there was space enough at the

end of the closet for a person to get up ; the closet had been a stairway, and had been boarded over; I went down into the cellar and examined the stairway, and found that a person could go up from the cellar through that opening."

Hattie Smith was then sworn, and said, referring to the defendant—

" *A.* She showed me the closet; I believe Mr. McHorney was with me at the time, and I noticed there was a board off; she said the board was loose, it was only nailed temporarily. *Q.* Did she say anything about her crocks there? *A.* I believe she described to officer McHorney how the crocks were sitting before, but I don't exactly remember; she told him that the ones that had stood on the board before had been disturbed."

The testimony of Jennie R. Smith, the defendant, who was then examined, was as follows—

" *Q.* The next morning, after the people came there, and McHorney was there, what, if anything, attracted your attention to the closet over the cellar? *A.* I was in the parlor, sitting by the bed room door ; the captain called me to the bed room, and asked me about the windows—whether I left them in that condition; I said, 'Yes;' he was speaking to me, and he said, 'Come this way,' and passed into the kitchen; he asked me if the small window that was up that morning, if I always left that open ; I said, 'Yes;' he then attracted my attention to the window by the hydrant, and asked me if that window was always so; I think that is what he said, and I said 'Yes;' then pointing to the door that led upstairs, I said, 'That leads upstairs into the bath room;' he had a little lamp in his hand; he was about to open the door leading into the yard, on the back stoop; he opened the door, and as he did so he noticed the closet door slam ; he said, 'What is this?' I said, 'This is a closet;' and as I opened it he looked at me; I suppose I must have been surprised ; I saw everything in a different manner from what I had been in the habit of keeping it ; he said, 'Do you keep those things that way?' I says, 'No; I generally keep them crosswise;' there

was two or three pans, or two or three pots; they was all in a straight line; he asked me if the closet looked to be the same; I said I didn't think it did; the hole in the back of the closet looked very much larger; I said, 'It looks as if something was taken away;' he says, 'That will do; you had better go in and sit down;' and I went back, and he went down stairs into the cellar, and I don't know what he done down there; when he came back he asked me if my husband had made a flooring in that stairway; I said he had; he asked me how long before; I don't know whether I told him or not; that was all that was said about the closet until the next day, when they showed me the board and asked me if I thought it belonged there, and I said I thought it did.'

And on her cross-examination she further answered—

"*Q.* Was the board ever out of that closet on any other occasion? *A.* No, sir; not since my husband put it in; he made the flooring and put it in; I never saw it after. *Q.* Did you call the attention of the persons there present to the condition of the closet and crocks, or did they call your attention to it? *A.* When Captain Lennon opened the back door it attracted my attention, and also his attention, and I said that was a closet, and I think he made a move to open it himself; I put my hand on it, and opened the door, and I said it had before been a stairway to get into the cellar, and my husband had boarded it as a closet; he noticed the place, and asked me if that was usually so, and I said 'No;' that I kept the pots and crocks in a different position, and that that space looked larger. *Q.* You have not answered my question; did you call the officer's attention to the condition of the closet in which the crocks were, or did he call your attention to it? *A.* He asked me if I generally kept it in that condition, and I said no, I did not. *Q.* Was there a market basket in the room? *A.* Yes; in the middle of the floor. *Q.* Where was that market basket in the morning? *A.* In the middle of the floor. *Q.* What kind of a basket was it? *A.* One with two lids on it; I generally kept it in the closet; I suppose it was there. *Q.* Did you call the attention of any of the offi-

cers to the market basket? *A.* Yes. *Q.* Do you recollect what you said about it? *A.* No; I said I had been in the habit of keeping the crocks and the pots crosswise in the closet, and that I generally had a market basket; I think he said, ' Is that the basket?' and I said ' Yes.' "

Then Captain Lennon, being recalled, said—

"*Q.* Do you remember stating in your original testimony about Mrs. Smith finding the bottle and the towel, and showing you the closet? *A.* Yes. *Q.* Do you remember opening the kitchen door at that time? *A.* Before going to the closet? *Q.* Yes. *A.* No. *Q.* You did not open the kitchen door before going to the closet? *A.* No. *Q.* Do you remember whether or not the wind, coming into the kitchen door, shook the door of the closet, and that attracted your attention to it? *A.* No, sir. *Q.* What attracted your attention to the door? *A.* Mrs. Smith opened it; I was passing along, looking for evidence; I went through the place, and this closet door was the first that attracted attention in passing from the bed room. *Q.* Who first went to the closet, you or Mrs. Smith? *A.* Mrs. Smith; she was in advance of me; she preceded me; she opened the closet door before I got to it."

The last witness on the subject was Mary F. Phillips. This woman, a considerable time after the murder, was in jail with the defendant, being imprisoned on a charge highly criminal, and of which she admitted her guilt. She was asked if she had held a conversation with the defendant; and having answered in the affirmative, was asked what it was. She said—

"*A.* One day we were speaking about her husband's death, and I asked her how she thought the person came into the house that done it, and she said that they came in through the closet. *Q.* Anything else? *A.* No, sir. *Q.* Is that all she said about it? *A.* That is all."

This is the sum of the testimony on this topic.

From this series of citations it is, in my opinion, conspicuously evident that there was no foundation in the testimony in this case for the attribution to this defendant of a story on

the subject in question.  She never, at any time or on any occasion, pretended to know anything about it.  When assisting the officers in their search, she opened the door of this closet, and stated, what was undoubtedly the fact, that the hole at the back seemed larger than it had been, and that what she called her crocks had been moved from their usual position, and some time afterwards, when asked her opinion by her companion in jail, she said the person that had committed the murder had come in through the closet.  Such was her inference, but did she ever have a "story" with regard to the matter, to the truth of which she was so committed that, as the case was put by the charge upon the falsification of it by the evidence, she was convicted of falsehood and of having resorted to a contrivance to turn aside suspicion?  She no more stated the fact in question as a matter within her experience, than did the policeman who theorized upon the subject, and drew a similar inference, state it as a fact within his experience.  It is to be remembered also, in this connection, that this defendant gave a history of her own relation to this affair that entirely negatived all pretence that she claimed to have any knowledge, derived from her senses, with respect to the particular in question.  In the account that she gave of her own stupefaction by chloroform—an account which, if untrue, is such a marvel of plausibility—she said that she was asleep when the assassin entered the room, and that she did not return to consciousness until after he had gone.  There was no room here, therefore, for any story on her part as to either his coming or going.  She not only did not tell a story in this respect, but she precluded the possibility of her doing so.  The chloroform transaction had been verified by her senses, according to her statement, and she had a story to tell about that, and of which story truth or falsehood could be predicated; but with regard to the matter now investigating it was impossible, by her own showing, that she could have anything to tell that had been thus verified by her senses, so that a moral test could be applied to it.

And at this point it is well to notice that there was nothing

in the testimony in this case that led, inevitably, to the con-clusion that the displacement of the floor, and of the articles in this closet, had been the work of the murderer, for .there was no evidence whatever to show even that these things were done on the night of the homicide. Neither Mrs. Smith nor any other witness testified with respect to the time when this closet had been last seen in its normal condition. For aught that appeared, the board may have been out of its place and the jars disarranged for days, or even weeks, prior to the time of the commission of the crime. Mrs. Smith said that this board was loose, and who, therefore, could confidently say that, for some purpose undisclosed to us, or by mere accident in moving the articles in the closet, the murdered man him-self, in the evening preceding the morning of his death, or at some antecedent time, may not have displaced this board, and thus have occasioned its fall into the cellar? In addition to this, it by no means followed the conclusion that this disturb-ance of the closet was the work of the assassin, that he had effected either his entrance or his exit through this opening, for he may have made the attempt, and have been balked, by reason of the opening being too small. In such a situation of the proofs, and in the presence of the declaration of this defendant, that she was asleep at the point of time when the assassin entered, it becomes clear how important, and at the same time how unverified by the evidence was the judicial averment that her story was "that somebody came in by this broken floor." After great labor and painstaking I have failed to find anything in the proofs that will lay the least foundation for such allegation.

Nor is there, to my mind, any relief to the situation in the suggestion that from the nature of the proofs it is obvious that the imputation of this story to this defendant, as a part of her narration of the things seen or known by her, was not designed or intended to be made, but was a mere slip in phraseology, and that it must have been so regarded by the jury. I cannot get rid of the difficulty in that way, for it appears to me that it is impossible to square the context of

the charge with such a hypothesis, and for the reason that the imputation of such a narration to this defendant is a premiss indispensable to the conclusion which is immediately afterwards suggested by the learned justice to the jury.   Nothing can be clearer that unless this premiss is posited the deduction thus suggested is false.   This is the course of reasoning on this point, as I read it in the charge: this woman told the story that the murderer " came in by this broken floor," and if it appears that such aperture is so small that such coming was impossible, then she told an untruth, and therefore " the closet, the crocks and the board are but deceptive appearances contrived by her alone, or some one with her, to elude inquiry and to avert suspicion."   It will be here observed that, granting the fact that the defendant made the statement imputed to her, the reasoning is consequential and the inference legitimate ; \ but if the imputed statement is not granted, the inference is in the air.   The admissibility of the deduction that the closet, the crocks and the board are deceptive appearances contrived by the defendant, depends wholly on the condition that she is convicted of an untruth in the assertion of the fact that the assassin came in through the open floor.   Her false statement is a necessary postulate to the conclusion to which the jury was pointed, and such necessity becomes at once manifest if we omit such postulate, and substitute in its stead the real facts in proof.   Doing this, the instruction to the jury on this point would run thus: this defendant called attention to this closet and to the removal of the board and the jars, and she expressed an opinion that the murderer had come in this way ; and if it appears that the murderer could not have so entered, then such an erroneous opinion on her part is strong evidence that she was a participant in the act, and the closet, the board and the crocks are deceptive appearances contrived by her.   This, of course, is all disjointed, and I am forced to think it plain that the judicial reasoning cannot be made intelligible on any other basis than the assumption that the defendant was charged with the statement in question.   It is, consequently, in my judgment, impracticable,

to eliminate from this charge this direct ascription to her of a story that was not hers.

It has already been said that it is competent for the judge presiding at a criminal trial to lay before the jury for their consideration his own views and inferences from the proofs, and that such expressions, no matter how ill advised or erroneous, can be reviewed on a motion for a new trial, but not on a writ of error; but the defect in this case is that a story is imputed to this defendant, and put in her lips, which she never uttered, and thus a fact, of the utmost importance, is, by unguarded expressions, imported into the testimony, and the introduction among the proofs of such foreign admixture must of necessity be held to constitute error in law.

Believing as I do, therefore, that at the trial at the Oyer errors appear in these important particulars, and that such errors must have prejudiced both these defendants on the trial of the merits of the case, I shall vote to reverse the judgment contained in this record.

DALRIMPLE, J. I do not understand the opinion just read by the Chief Justice at all unsettles the rule heretofore adopted and long acted upon in this state, that a judge presiding at the trial of an indictment may comment upon the facts and circumstances in evidence. I therefore concur in the reversal of the judgment below on the legal point taken in the opinion read.

I desire further to say that what is called in the case the eight-page letter was, if not the turning point in the case, most important evidence. The court was asked in substance to charge that if that letter was susceptible of two constructions, one going to show guilt, and the other consistent with innocence, the jury should adopt the latter. I cannot find that this request was granted in terms, or otherwise. In this, I think, there was error, and for this additional reason I vote for reversal.

VAN SYCKEL, J. I cannot concur in the reversal of the

judgment in this case on the ground stated in the opinion read by the Chief Justice, but vote to reverse for another reason.

The counsel for the defendants requested the court to charge the jury that, " in construing the letter, if the words are susceptible of two meanings, the presumption is on the side of innocence," which request was refused.

This letter was of such importance in the case that the judge told the jury " that without it the testimony would have been quite weak to connect Bennett with the transaction." It was of the highest importance, therefore, to the defendants that the legal rule for its interpretation should have been accurately stated.

In the absence of the special request, no error could be found in the instructions of the judge on this point; the general rule he laid down was correct, but a further duty devolved upon him when the specific request to charge was made.

It was not competent for the defendants to ask the court to charge that if this letter, standing by itself as an independent, isolated piece of evidence in the cause, was susceptible of two meanings, that in favor of innocence should be favored.

The defendants had no right to separate any matter of evidence from the whole case, and demand such instructions with reference to it exclusively. If such a request had been made, it would have been properly denied, but I do not understand that to be a fair interpretation of the request to charge.

It must be understood to have been made with reference to the attitude in which the parties defendant were placed by all the testimony in the case, as the case of the state was presented when all the testimony was in.

In that view the request was a proper one, and the court should have charged the jury that, in construing the letter, if the language of it was susceptible of two meanings, under a fair consideration of all the testimony and circumstances of the case, giving to such testimony and circumstances due

weight and importance, then the presumption was on the side of innocence.

In the failure so to charge, in my opinion, there was error, for which the judgment should be reversed.

THE CHANCELLOR and Judges DIXON and GREEN concurred in this opinion.

*For affirmance*—REED, WOODHULL, CLEMENT. 3.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DALRIMPLE, DEPUE, DIXON, SCUDDER, VAN SYCKEL, DODD, GREEN, LATHROP, LILLY, WALES. 12.